# UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF WEST VIRGINIA
### (Beckley)

**C.H.,**

Plaintiff,[1]

v.                                                 Civil Action No. 5:19-cv-00645

                                                   **JURY TRIAL DEMANDED**

**David R. Wilson, FPC Alderson;**
**Jerrod R. Grimes, FPC Alderson;**
**Scott A. Hall, FPC Alderson;**
**Lieutenant Workman, FPC Alderson;**
**and, The United States of America,**

Defendants.

## AMENDED COMPLAINT

### NATURE OF THE CASE

**1.**     This is a civil action in which Plaintiff, C.H., by and through her attorneys, brings

claims based on the Eighth Amendment to the United States Constitution against

Defendants Jerrod R. Grimes, Scott A. Hall, David R. Wilson, Lieutenant Workman,

pursuant to *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics,*

403 U.S. 388, 91 S. Ct. 1999, 29 L. Ed. 2d 619 (1971). Plaintiff C.H. also brings claims

against the United States of America pursuant to the Federal Tort Claims Act ("FTCA"),

28 U.S.C. § 2671, *et seq.*

---

[1] These initials are a pseudonym used in this instance as the plaintiff is a victim of rape. She also
has a legitimate fear of retaliation from correctional officials and/or present or former inmates
for making public allegations regarding correctional officers.

**2.** C.H., while an inmate in the custody of the Federal Bureau of Prisons ("BOP") was caused to endure repeated episodes of sexual assault and sexual battery by Captain Jerrod Grimes and needlessly suffered as a result.

**3.** C.H. brings this suit to recover for the negligent acts of the BOP employees named herein, who failed in their duty to protect her from the known risk that Defendant Grimes posed to her and to all inmates confined at FPC Alderson.

**4.** As a result of the repeated assaults visited upon her while she was an inmate at FPC Alderson, C.H. suffered injuries to include: physical and sexual battery, and the dignitary injury of being forced to endure sexual activity to which she did not consent, for which she had neither the legal nor volitional capacity to consent and from which she had no lawful means of escape.

## JURISDICTION AND VENUE

**5.** This Court has subject matter jurisdiction over this matter pursuant to U.S.C. §§ 1331 & 1346 (b)(1) as the claims in this case are brought against the United State of America under the Federal Tort Claims Act (FTCA), 28 U.S.C. 2671, et seq. and against the individual Defendants under the Eighth Amendment to the United States Constitution, pursuant to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics, 403 U.S. 388 (1971)*.

**6.** Venue is appropriate in this Court pursuant to 28 U.S.C. § 1402(b), as all the events which give rise to this course of action occurred in the Southern District of West Virginia.

**7.** Plaintiff has exhausted her federal tort claim administrative remedies as she filed an Administrative Tort Claim (Form 95) on February 4, 2019 with the Federal Bureau of

Prisons' Mid-Atlantic Regional Office. As the six-month time period for a response has passed without Plaintiff having received a response, her claim is considered denied and exhausted.

## PARTIES

Plaintiff

**8.**     The Plaintiff, C.H., is a thirty-five (35) year old Virginia resident who was charged with drug-related offenses and convicted of same in December 2016 pursuant to the U.S. Federal Criminal Code. C.H. is no longer in custody.

Defendants

**9.**     The United States of America is a sovereign entity named herein pursuant to the FTCA.

**10.**     Defendant the United States of America oversees the Federal Bureau of Prisons "Bureau" or "BOP", which is responsible for the custody and care of federal inmates.

**11.**     David R. Wilson was, at all times relevant to this complaint, a BOP employee and, on information and belief, a West Virginia resident. Defendant Wilson ("Warden Wilson") was Warden of FPC Alderson, in which capacity he had full administrative responsibility for the entire institution. As Warden, Defendant Wilson exercised overall responsibility for facility-wide adherence to BOP policy concerning sexually abusive behavior by FPC Alderson guards against inmates. As Warden, Wilson was responsible for ensuring compliance with BOP, FPC and PREA-mandated standards. He was also responsible for supervising, training, and disciplining correctional officers at FPC Alderson. Warden Wilson is named in both his official and individual capacities.

**12.**     Jerrod Grimes is a convicted serial sexual abuser of BOP inmates. At all times relevant to this complaint, Jerrod Grimes ("Captain Grimes" or "Grimes") was employed

by the BOP as Captain of FPC Alderson, in which capacity he supervised all security and correctional functions of the prison and had authority to initiate inmate disciplinary proceedings and to influence inmate housing and work assignments. Captain Grimes was responsible maintaining the security and safety of inmates at FPC Alderson.

13.    Captain Grimes was, at all times relevant to this action, the staff-member responsible for monitoring potential retaliation against inmates victimized by sexual abuse or sexual harassment at FPC Alderson, pursuant to the BOP's PREA-mandated policy concerning sexually abusive behavior prevention and intervention. Captain Grimes is named in both his individual and in his official capacities.

14.    At all times relevant to this complaint, Correctional Officer Workman ("Lt. Workman") was a correctional officer at FPC Alderson and, on information and belief, a West Virginia resident. At all relevant times, Lt. Workman was responsible for, among other things, maintaining security at FPC Alderson and for providing supervision, care and correctional treatment of inmates incarcerated there, including C.H.[2] Lt. Workman is named in her individual capacity.

15.    At all times relevant to this complaint, Scott Hall ("Officer Hall" or "Hall") was employed as a correctional officer at FPC Alderson and, on information and belief, a West Virginia resident. At all times relevant to this complaint, Officer Hall was responsible for, among other things, maintaining security at FPC Alderson and for providing supervision, care and correctional treatment of inmates incarcerated there, including C.H.  Officer Hall is named in his individual capacity.

---

2  Bureau of Prisons Position Description, Correctional Officer Series, GS-0007.

**16.**     All defendants above were, at all times relevant to this complaint, acting under color United States law.

**FACTUAL BACKGROUND**

**17.**     On or about 21 April, 2017, C.H. entered FPC Alderson to serve a 36 month custodial sentence for drug charges.

**18.**      BOP policy requires the training of all employees who may have contact with inmates on how to fulfill their responsibilities under agency sexual abuse and sexual harassment prevention, detection, reporting, and response policies and procedures.

**19.**     Program Statement 5324.12, "Sexually Abusive Behavior Prevention and Intervention Program" is the controlling BOP policy addressing the prevention of, and intervention upon, sexually abusive behavior.

**20.**     Program Statement 5324.12 is circulated agency-wide and applies to all facilities operated by the BOP and every staff member working within each correctional facility.

**21.**     BOP policy concerning the prevention of, and intervention upon, sexually abusive behavior implements zero tolerance toward all forms of sexual activity, including sexual abuse and sexual harassment, and provides guidelines to address the prohibited and/or illegal sexually abusive behavior involving, *inter alia,* staff perpetration against inmate victims.[3]

**22.**     BOP policy mandates particular staff and agency reporting duties with respect to sexually abusive behavior, including concerning incidents or possible incidents of sexual abuse or sexual harassment: it mandates that "[a]ll staff must report information

---

3  Program Statement 5324.12, Sexually Abusive Behavior Prevention and Intervention Program. "Purpose and Scope" pg. 1.

5

concerning incidents or possible incidents of sexual abuse or sexual harassment to the Operations Lieutenant, or where appropriate, in accordance with the Program Statement "Standards of Employee Conduct".[4]

**23.**     Standards of employee conduct are mandated by BOP Program Statement 3420.11, which is also is circulated agency-wide and applies to all facilities operated by the BOP and every staff member working within each correctional facility. [5]

**24.**      BOP Standards of employee conduct are enumerated in Program Statement 3420.11. Each new BOP employee, contractor, and volunteer must receive and sign a form acknowledging receipt of Program Statement 3420.11.

**25.**     On information and belief, as BOP employees, Defendants Wilson, Grimes, Hall, and Workman received and signed for updated versions of Program Statement 3420.11.

**26.**     BOP policy requires that Acknowledgement of Receipt of Standards of employee Conduct Form (BP-A0165) in the respective Official Personnel Folders of all employees, pursuant to BOP Program Statement 3420.11.

**27.**     Program Statement 3420.11 mandates that "[n]o employee shall engage in, or allow another person to engage in, sexual behavior with an inmate".[6]

**28.**      As BOP employees, Defendants Wilson, Grimes, Hall, and Workman would have been aware that "[e]mployees are subject to administrative action, up to and including removal, for any inappropriate contact, sexual behavior, or relationship with inmates,

---

4  Program Statement 5324.12, Sexually Abusive Behavior Prevention and Intervention Program, §115.61.

5  Program Statement 3420.11. Standards of Employee Conduct.

6   Program Statement 3420.11. Standards of Employee Conduct § 3. "Publication and Interpretation". pg. 5.

regardless of whether such contact constitutes a prosecutable crime. Physical contact is not required to subject an employee to sanctions for misconduct of a sexual nature".[7]

**29.**     The above policies and procedures with respect to prevention, detection, reporting, and response to sexual abuse and sexual harassment were or at least should have been well-known to Officer Hall, Lt. Workman, Captain Grimes and Warden Wilson - just as they were well known to all other employees and staff at FPC Alderson.

### Lt. Hall's Sexual Abuse of C.H.

**30.**     In July 2017, Officer Hall began having inappropriate contact with C.H., to include boundary violations such as intimate conversations concerning his dissatisfaction with his marriage, overtures of a romantic nature, and the passing of love notes from him to her.

**31.**     18 U.S.C. § 1791(a)(1) prohibits providing or attempting to provide any contraband item to an inmate of a prison.

**32.**     28 CFR § 500.1(h), defines contraband as "material prohibited by law, or by regulation, or material which can reasonably be expected to cause physical injury or adversely affect the security, safety, or good order of the institution."

**33.**     Officer Hall violated 18 U.S.C. § 1791(a)(1), (b)(5) while working as an employee of the BOP as a correctional officer at FPC Alderson, and subsequently pled guilty to one count of same.

**34.**     Hall was imprisoned for 30 days and paid a court assessment of $10 for this violation, which consisted in "knowingly and unlawfully provid[ing] notes of a romantic

---

7  Program Statement 3420.11. Standards of Employee Conduct § 5. "Personal Conduct". pg. 6.

nature, a prohibited object, to an inmate at Federal Prison Camp at Alderson" with an "Offense Ended" date of September 2017.[8]

**35.** The term "boundary violation" refers to conduct that crosses the line between established norms of professional relationships between BOP staff and their inmate wards. Boundary violations are well-recognized as precursors to sexual activity between prison staff and inmates. [9]

**36.** On information and belief, Hall's conduct toward C.H. escalated to include his making comments concerning her body, his physical attraction to her, and his practice of fantasizing about her while masturbating outside of work hours.

**37.** Hall required C.H. to participate in clandestine meetings in empty or unobserved spaces at FPC Alderson, whereupon he kissed her and groped her breasts, vagina and buttocks through her prison-issued clothes.

**38.** Hall's inappropriate relationship with C.H. was, at that time and throughout, well-known to Defendant Grimes.

**39.** Sexual activity between inmates and correctional officers is prohibited by West Virginia state law and by federal law.

**40.** Sexual activity between inmates and correctional officers is also clearly prohibited by BOP policy, agency-wide.

---

8  Judgment. Case Number: 5:19-cr-00090. April 16, 2019.

9  Cheeseman Dial, Kelly & Worley, Robert. "Crossing the Line: A Quantitative Analysis of Inmate Boundary Violators in a Southern Prison System". *American Journal of Criminal Justice*. 33. 69-84, 2008.

**41.**     BOP policy addresses the notion of consent with respect to sex between guards and inmates. Program Statement 3420.11 clearly states: "[t]here is never any such thing as *consensual* sex between staff and inmates".[10]

**42.**     In the face of clear boundary violations between Hall and C.H., Captain Grimes failed to properly investigate the same in view of mitigating the risk of potential future sexual abuse or sexual assault Hall may have posed to C.H. and/or any other of FPC Alderson's inmates.

**43.**     BOP policy requires staff to immediately take appropriate steps to safeguard an inmate victim when sexually abusive behaviors have been reported, including reassignment of the alleged perpetrator to another post at the camp, placing the alleged perpetrator on administrative leave, and/or placing the alleged victim in protective custody or transferring them to another federal, state or local facility.

**44.**     In the face of what he knew to be sexually inappropriate conduct, Captain Grimes took no steps to investigate it, intervene upon it, or otherwise report it to other responsible staff members.

**45.**     It was Captain Grimes's duty – just as it is the duty of all BOP employees and staff at FPC Alderson – to report sexually inappropriate relations and/or suspected incidents of sexual abuse between staff and inmates immediately to the Warden.

**46.**     Captain Grimes did not formally report or refer for investigation these known or suspected incidents of sexual abuse, nor did he take steps to safeguard C.H. from further sexual abuse by Hall as it was his duty to do. Instead, he used his knowledge of same as a means of coercing C.H. to submit to *ad hoc* informal interrogations by him.

---

10  Program Statement 3420.11. Standards of Employee Conduct § 5. "Personal Conduct". pg. 6.

9

**47.**     Captain Grimes used the false pretense of an investigation into Hall's conduct as a means of interrogating, threatening, and intimidating C.H., and /or as a means by which to gain unsupervised access to her in furtherance of his own campaign of sexual predation against her.

**48.**     BOP policy requires staff to protect inmates reporting or cooperating with sexual abuse investigations from retaliation by other inmates or staff.

**49.**     Moreover, BOP policy required FPC Alderson to formally designate a staff member responsible for monitoring compliance with the anti-retaliation policy described above. Captain Grimes was that designated staff person.

**50.**     Captain Grimes's conduct toward C.H. was retaliatory.

**51.**     This conduct involved, variously, communicating to C.H. that the "guards stick together," that his concern was the "protection of one of his Lieutenants," and that C.H., not Hall, would be the one to suffer consequences if Hall's abuse of C.H. was discovered.

**52.**     Captain Grimes' conduct was calculated to threaten, isolate, and coerce C.H., and it placed her in substantial fear that she would suffer further sexual abuse by Hall and – ultimately – by Captain Grimes himself.

**53.**     Captain Grimes used his position as Captain to increase C.H.'s vulnerability, then capitalized on it.

## Sexual Abuse of C.H. by Captain Grimes

**54.**    C.H. stands 4'11" tall and weighs roughly 130 lbs. Captain Grimes was, at all times

relevant to this complaint, nearly one foot taller than C.H. and outweighed her by

approximately 50 lbs. [11]

**55.**    Captain Grimes also had access to the entire institution and exercised significant

control over all the staff at FPC Alderson. As Captain, Grimes had the power to

discipline, to transfer, or otherwise to threaten C.H.

**56.**    Captain Grimes threatened C.H. that if she reported these and other instances of

sexual abuse that she – not he – would be the one to suffer consequences, to include

administrative sanctions, punishment, loss of privileges, and/or immediate transfer to a

higher-security prison or to a prison with harsher conditions.

**57.**    On or about November 3, 2017, Captain Grimes isolated C.H. in a back room of

FPC Alderson's Annex building.

**58.**    Captain Grimes then forcibly thrust his tongue into C.H.' mouth.

**59.**    C.H. was shocked by this assault and began to shake.

**60.**    On information and belief, this assault was interrupted when the sound of keys

could be heard and the room was entered by another unknown correctional officer,

whereupon Captain Grimes backed away from C.H.

**61.**    The unknown officer saw C.H. and Defendant Grimes alone in the room.

**62.**    The unknown officer, on seeing Captain Grimes in a room alone with C.H., who

was visibly shaken and apparently upset, should at the very least have reported this

---

[11]  At the time of his arrest in Marion County, Florida on 2 April, 2018, Captain Grimes stood 5'9" and
weighed 180lbs.

inappropriate contact to Special Investigative Services ("SIS"), the investigative department of the institution.

**63.**   It is unknown whether a report was ever made and Captain Grimes' escalating sexual abuse of C.H. continued undeterred.

**64.**   Captain Grimes made sexually suggestive comments to C.H. when in the presence of other staff and inmates when he was sure that no one was in earshot, and these were calculated to be shocking so as to cause her fear, discomfort and emotional distress.

**65.**   C.H.'s reaction to these comments was visible and apparent to other correctional staff, who failed to report, question, or intervene upon his conduct toward her.

**66.**   On other occasions, Captain Grimes forcibly groped or otherwise touched C.H. when he believed others were not looking.

**67.**   Captain Grimes stalked C.H. by placing inordinate attention on her and her whereabouts and by attending the education building, where she was assigned to work.

**68.**   Captain Grimes communicated to C.H. his plan to rape her and told her that there was nothing that she could do about it.

**69.**   C.H. suffered anxiety and lived with a pervasive and well-founded fear that she would be raped by Captain Grimes.

## Captain Grimes Rapes of C.H.: First Incident

**70.**   In November 2017, C.H. was called by name from pill pick-up by an unnamed staff member to the administrative area of the compound and C.H. complied.

**71.**   On her arrival at the administrative wing, C.H. was summoned by Captain Grimes to his office, whereupon she went through another room which separated his office from the common area where other staff members were present.

**72.**   These other staff members observed C.H. as she walked through the common area to Captain Grimes' office.

**73.**   Captain Grimes ordered C.H. to be quiet and C.H. complied because she feared Captain Grimes.

**74.**   Captain Grimes got up from his chair and stood in front of C.H.

**75.**   Captain Grimes ordered C.H. to take her pants down.

**76.**   C.H. did not comply with Captain Grimes' order. C.H. said "no."

**77.**   Captain Grimes forcibly turned C.H. so that she was facing away from him.

**78.**   Captain Grimes pulled C.H.'s pants down.

**79.**   Captain Grimes forced C.H. to bend at the waist over a small table while he put on a condom.

**80.**   Captain Grimes raped C.H.

**81.**   C.H. suffered physical pain as a result Captain Grimes' forcible penetration of her vagina by his penis. C.H. relates that it was painful to be raped by Captain Grimes.

**82.**   C.H. was shocked and frightened as a result of this rape. C.H. suffered serious emotional distress in the immediate aftermath of this rape.

**83.**   Minutes later, when Captain Grimes had finished raping C.H., he ordered her to pull up her pants and leave his office.

**84.**   On information and belief, both Warden Wilson and Lt. Workman were within yards of Captain Grimes' office while he raped C.H.

**85.**   C.H. was visibly shaken and was clearly distraught when she left Captain Grimes' office.

**86.**   C.H. made a point to establish meaningful eye contact with Lt. Workman as she left Captain Grimes' office, believing that she could rely on Lt. Workman to make an

13

inquiry as to why C.H. was alone in Captain Grimes' office and believing that Lt. Workman would take steps to document or report the incident as suspicious.

**87.**    Neither Warden Wilson nor Lt. Workman intercepted C.H. as she left Captain Grimes' office, nor did either make any formal or investigative inquiry at the time – as was their duty according to BOP policy - as to why Grimes was alone with C.H. unsupervised in his office.

**88.**    Both Warden Wilson and Lt. Workman were required to document and report information concerning possible incidents of sexual abuse in accordance with BOP policies concerning sexually abusive behavior and intervention prevention and standards of employee conduct.[12]

**89.**    Neither Warden Wilson nor Lt. Workman took steps to document or report this suspicious incident.

**90.**    Neither Warden Wilson nor Lt. Workman took steps to protect C.H. from Captain Grimes on that day, or to address the risk of further rape that Captain Grimes posed to C.H.

---

12  Program Statement 5324.12 Sexually Abusive Behavior Prevention and Intervention Program, §115.61 Staff and agency reporting duties. "All staff must report information concerning incidents or possible incidents of sexual abuse or sexual harassment to the Operations Lieutenant, or where appropriate, in accordance with the Program Statement "Standards of Employee Conduct". Program Statement 3420.11 Standards of Employee Conduct. An employee may not engage in, or allow another person to engage in, sexual behavior with an inmate. There is never any such thing as *consensual* sex between staff and inmates. Employees are subject to administrative action, up to and including removal, for any inappropriate contact, sexual behavior, or relationship with inmates, regardless of whether such contact constitutes a prosecutable crime. Physical contact is not required to subject an employee to sanctions for misconduct of a sexual nature.

**91.**     C.H. herself could not have prevented this first rape because she did not have sufficient physical strength relative to his, nor the freedom to fight back, to run away, to avoid him, to lawfully flee FPC Alderson, or to have her "no" treated as final.

**92.**     C.H. did not report this first rape because she was shocked, ashamed, and feared being punished rather than being treated as a victim, as she had been warned by Captain Grimes. She also believed that the suspicious circumstances surrounding the rape were so obvious to Lt. Workman and Warden Wilson that they would either investigate on their own initiative or that they must already know about and therefore be complicit in his illegal conduct.

**93.**     However, Lt. Workman and Captain Grimes, together, had already engaged in a campaign of sexual harassment against another inmate, J.D.[13] together.  This involved, variously, ordering J.D. to perform sexually suggestive dances in front of them and another guard, making comments in each other's company concerning J.D.'s body and attractiveness.

**94.**     On information and belief, Lt. Workman had a standing agreement with Captain Grimes which involved his providing her with access to inmate J.D., who Lt. Workman was actively grooming for a sexual relationship. In return, Lt. Workman did not intervene upon or report Captain Grimes's sexual abuse of other prisoners, including C.H.

---

[13]  These initials are a pseudonym used in this instance as this person is a victim of sexual misconduct. She also has a legitimate fear of retaliation from correctional officials and/or present or former inmates for making public allegations regarding correctional officers.

## Captain Grimes Rapes of C.H.: Second Incident

**95.**    In November 2017, Captain Grimes entered C.H.'s shared housing unit after midnight and ordered her to go to a stairway and C.H. complied because she feared Captain Grimes.

**96.**    Captain Grimes ordered C.H. to walk from the stairway to a staff bathroom where, again, he put on a condom and raped C.H. for a second time.

**97.**    C.H. suffered physical pain as a result Captain Grimes' forcible penetration of her vagina by his penis during this second rape.

**98.**    C.H. suffered serious emotional distress in the immediate aftermath of this second rape.

**99.**    C.H. was shocked and frightened as a result of this second rape.

**100.**    Returning to her unit following this second sexual assault, C.H. told another inmate in her housing unit, Mrs. Sugarman, that Captain Grimes had raped her.

**101.**    Having related the details of this latest sexual assault to Mrs. Sugarman, C.H. was upset and crying and went to the bathroom to clean herself.

**102.**    In the course of cleaning herself, C.H. found what she believed to be Captain Grimes' pubic hair on her body. C.H. preserved this hair as evidence on a piece of adhesive tape and gave it to Mrs. Sugarman, who kept the pubic hair for safekeeping and who kept C.H.'s story in confidence.

**103.**    On December 20, 2017, C.H. was summoned to the administrative offices at FPC Alderson.

**104.**    While waiting on a bench outside the administrators' offices, Captain Grimes approached C.H. and ordered her not to appear nervous.

**105.**   Captain Grimes told C.H. that an inmate had "reported her" for having an inappropriate relationship with Hall.

**106.**   C.H. was taken in handcuffs to the Receiving and Discharge area ("R&D") by Warden Wilson, Lt. Oakes, and Captain Grimes. Fearing further retaliation from Captain Grimes, who had already raped her, and fearing that – as Grimes had already threatened – she would face sanctions for an inappropriate relationship with a guard, she denied that she had an ongoing inappropriate relationship with Hall.

**107.**   C.H. was ordered back to her unit and returned there.

**108.**   C.H. feared retaliation, including administrative sanctions, punishment, loss of privileges, and/or immediate transfer to a prison with harsher conditions, for refusing to cooperate with the investigation of Hall.

**109.**   C.H. disclosed to another inmate, J.G.[14], that she had been raped by Captain Grimes and was in imminent fear of retaliation by Warden Wilson and Captain Grimes.

**110.**   C.H. expressed to J.G. that she was afraid that Captain Grimes would rape her again.

**111.**   J.G. encouraged C.H. to make a full and formal report of the sexual assaults to Lt. Workman, whereupon C.H. immediately presented herself to Workman's office, where Lt. Workman was speaking with her inmate "secretary", J.D.

**112.**   On information and belief, J.D. was informed by Lt. Workman during this very conversation that Captain Grimes had already raped C.H. in his office.

---

[14] These initials are a pseudonym used in this instance as she is a witness to allegations of sexual misconduct by correctional officers and has a legitimate fear of retaliation from correctional officials and/or present or former inmates for making public allegations regarding correctional officer

**113.**   C.H., who had by now come into Lt. Workman's office, got physically close enough to Lt**.** Workman to whisper that Captain Grimes had already twice raped her and that she was afraid he was going to rape her again.

**114.**   On information and belief, Lt. Workman – faced with the possibility of an investigation of her own conduct, and who by now could no longer plausibly ignore or deny Captain Grimes's sexually abusive conduct toward C.H. and other inmates, instructed C.H. and J.D. to get into a vehicle with Officer Honaker in order to evade Captain Grimes, who was by now aware that he was under investigation and who was searching the compound for both inmates.

**115.**   Lt. Workman asked Officer Honaker, to hide C.H. and J.D. somewhere safe, whereupon Honaker drove both inmates to the woods and turned off the headlamps of the car, instructing both inmates to get out of the vehicle and run to safety if they saw lights approaching.

**116.**   While waiting in the vehicle in the woods, Officer Honaker related to C.H. and to J.D. that she and other unnamed officers were aware that Captain Grimes was raping or otherwise sexually abusing inmates at Alderson and that this had been going on for a period of "years".

**117.**   On or about 21 December, 2017 Warden Wilson authorized Captain Grimes' resignation and he left FPC Alderson.

**118.**   On or about 21 December, 2017 Warden Wilson also authorized Hall's resignation and he too left FPC Alderson .

**119.**   On information and belief, Lt. Workman is still employed by the BOP and continues to work as a correctional officer at FPC Alderson.

**120.**   Captain Jerrod Grimes was subsequently indicted. Later, he pled guilty to thirteen counts of sexual abuse of a ward and abusive sexual contact contrary to 18 U.S.C. § 2243(b) and 18 U.S.C. § 2244(a) (4).

**121.**   The first count of sexual assault of a ward to which Grimes entered a guilty plea dates back to November 2016, a full year before he began sexually assaulting C.H.

**122.**   Grimes' conduct continued for more than a year and ended only when he resigned after observing victims being interviewed by investigators on 21 December 2017.

## BOP's Deficient Investigation of Captain Grimes' Sexual Predation and Failure to Timely Respond to Formal Complaints

**123.**   BOP policy provides that inmates are encouraged to report allegations of sexually abusive behavior to staff at all levels, including local, regional and Central Offices.[15]

**124.**   On 29 April, 2017, an Alderson inmate, V.J.[16], drafted a formal administrative remedy request (a "BP-9") concerning an incident involving Grimes.

**125.**   In her BP-9 request, V.J. relates that Grimes, in plain view of several inmates in her housing unit, lost his temper and physically backed her into her living quarters, demanding that she sit down in the chair behind her.

---

15 Program Statement 5324.12 Sexually Abusive Behavior Prevention and Intervention Program, §115.51 "Inmate Reporting". Pg. 35.

16 These initials are a pseudonym used in this instance as she is a victim of sexual misconduct who made formal complaints regarding the same. She also has a legitimate fear of retaliation from correctional officials and/or present or former inmates for making public allegations regarding correctional officers.

**126.**   V.J. further relates that "I covered my head and had to flinch to keep my mouth from being pressed to his crotch. I felt so helpless and victimized and violated". [17]

**127.**   This BP-9 request continues: "PLEASE HELP ME. My rights have been violated and so has PREA."[18]

**128.**   Further, V.J.'s BP-9 request states: "I cannot send this complaint through this institution...We are all scared of retaliation. It is very real here. I was already warned by Admin that it was a bad idea to pursue this and that the Captain had just had 'a bad day'".[19]

**129.**   On 18 May, 2017, V.J. sent an electronic request through the internal email at FPC Alderson to SIS asking why this incident had not been investigated. Describing this incident in the course of her emailed complaint, V.J. clearly identifies "the Captain" as engaging in conduct "violating  PREA".[20]

**130.**   V.J.'s BP-9 was received on 26 May, 2017 by regional counsel in the BOP's Mid-Atlantic Office.

**131.**   Four days later, on 30 May, 2017, the administrative remedy coordinator at the Mid-Atlantic Regional Office notified V.J. that her administrative remedy had been denied because she had not filed it through the institution for Warden Wilson's review.

**132.**   On 19 June, 2017, the BOP South Central Regional Office Legal Department received V.J.'s BP-9.

---

17  BP-9 Request for Administrative Remedy. April 29, 2017. Pg. 2.

18  BP-9 Request for Administrative Remedy. April 29, 2017. Pg. 2.

19  BP-9 Request for Administrative Remedy. April 29, 2017. Pg. 2.

20 BP-9 Request for Administrative Remedy. April 29, 2017. Pg. 2.

**133.**   Subsequent to V.J.'s formal complaints of sexually abusive conduct to SIS at FPC Alderson and to two separate regional offices, Grimes continued in his campaign of sexual abuse of inmates at FPC Alderson and raped C.H. twice.

**COUNT I**
**Eighth Amendment: Sexual Assault, Battery and Sexual Harassment**
**(Captain Grimes)**

**134.**   C.H. realleges and incorporates by reference the allegations of paragraphs 1-133 above.

**135.**   C.H. had – as do all inmates in the custody of the BOP have - a clearly established right under the Eighth Amendment to the United States Constitution not to be subjected to cruel and unusual punishment while incarcerated.

**136.**   Rape by a guard is not a legitimate form of punishment, it is not an ancillary component of any prison sentence, and it serves no legitimate purpose.

**137.**   Captain Grimes violated C.H.'s rights by repeatedly assaulting and raping her while she was incarcerated at FPC Alderson in November, 2017.

**138.**   Captain Grimes, individually, failed in his duty to provide C.H. with constitutionally safe and secure conditions of confinement by raping her.

**139.**   As a direct and proximate result of Captain Grimes' sexual assault, C.H. was subjected to unnecessary and wanton pain, and emotional and physical injury, and she is entitled to redress for this serious dignitary injury and for this violation of her person.

**140.**   Captain Grimes' sexual assaults of C.H. amount to inhumane and violent conduct that is outrageous in the extreme.

**141.**   All of Grimes', acts and omissions were taken while acting under color of law and in his position as a supervisor of FPC Alderson.

## COUNT II
## Eighth Amendment: Assault, Battery, and Sexual Harassment
## (Officer Hall)

**142.**   C.H. realleges and incorporates by reference the allegations of paragraphs 1-141 above.

**143.**   Officer Hall, individually, failed in his duty to provide C.H. with constitutionally safe and secure conditions of confinement by subjecting her to physical contact, the nature of which she did not have the capacity to consent.

**144.**   By touching C.H.'s breasts, buttocks, and vagina, in the absent of her capacity to consent to such touching, Officer Hall assaulted C.H. for the purpose of his own sexual gratification.

**145.**   All of Hall's, acts and omissions were taken while acting under color of law.

## COUNT III
## Eighth Amendment: Failure to Intervene
## (Warden Wilson, Lt. Workman, Officer Hall)

**146.**   C.H. realleges and incorporates by reference the allegations of paragraphs 1-145 above.

**147.**   On information and belief, Warden Wilson knew that Captain Grimes was sexually harassing and assaulting inmates at FPC Alderson. Officer Honaker told C.H. that it had been going on for "years." Warden Wilson had to have been apprised of the incident involving V.J. Warden Wilson was outside the door to the office when the first rape of C.H. occurred and must have known that Grimes had no legitimate reason for calling her to his office.

**148.**   Lt. Workman immediately knew the truth of C.H.'s report of rape because his sexually abusive conduct toward inmates and toward C.H. in particular was already well

known to her, given their prior arrangement to aid and abet each other in maintaining

and facilitating their sexual misconduct.

**149.**   Officer Hall was familiar with the situation regarding C.H. given his

inappropriate sexual activity with her, as alleged above. He was further aware of the risk

posed to C.H.  because Captain Grimes had asserted his superior rank – it would be he

(Captain Grimes) who would take over and continue the inappropriate sexual activity

with C.H. to the exclusion of Officer Hall.

**150.**   Warden Wilson, Lt. Workman, and Officer Hall were deliberately indifferent and

even complicit in the risk faced by C.H. relative to Captain Grimes by failing to take such

steps as could be reasonably expected to address the danger that he posed.

**151.**   The inaction of staff responsible for the custody, care, safety, and "correctional

treatment" of C.H. in the face of this known risk to her safety was a direct and proximate

cause of the violation of C.H.'s rights under the United States Constitution.

**152.**   The acts, omissions, policies, and practices of Warden Wilson, Lt.  Workman, and

Officer constituted a knowing violation of C.H.'s clearly established constitutional rights.

**153.**   C.H.'s constitutional right not to be sexually abused or assaulted in prison was

firmly established well before the BOP rules establishing mandatory procedures for

handling sexual abuse cases to comply with PREA went into effect on June 24, 2015.

**154.**   Warden Wilson, Lt. Workman, and Officer Hall failed in their respective duties to

provide C.H. with constitutionally safe and secure conditions of confinement by and

through their deliberate indifference to the substantial risk of imminent harm posed by

Captain Grimes.

**155.**   The policies, practices, acts, and omissions of Warden Wilson, Lt. Workman, and Officer Hall directly and proximately caused the violation of C.H.'s Eighth Amendment right to be free from sexual assault and rape while incarcerated.

**156.**   Warden Wilson, Lt. Workman, and Officer Hall directly and proximately caused the violation of C.H.'s rights under the Eighth Amendment of the United States Constitution by, as one example, failing to train, supervise, and discipline FPC Alderson staff and employees and/or report known or suspected sexual misconduct thereby failing to adequately prevent further constitutional violations.

**157.**   Warden Wilson, Lt. Workman, and Officer Hall directly and proximately caused the violation of C.H.'s rights under the Eighth Amendment of the United States Constitution by, as one example, failing to adhere to and /or ensure that FPC Alderson staff followed PREA-mandated policy for responding to suspected or known instances of sexual abuse at the institution, thereby failing to adequately prevent further constitutional violations.

**158.**   Warden Wilson directly and proximately caused the violation of C.H.'s rights under the Eighth Amendment of the United States Constitution by, as one example, failing to ensure the coordination of departments within the facility in preventing, detecting, intervening, and responding to sexually abusive behavior.

**159.**   Warden Wilson, Lt. Workman, and Officer Hall directly and proximately caused the violation of C.H.'s rights under the Eighth Amendment of the United States Constitution by consistently failing to establish and enforce procedures for investigations of disciplinary infractions or report the same so as to limit opportunities for FPC Alderson staff to be alone with inmates  unsupervised, providing the conditions

of opportunity for them to have sexual contact with, or to sexually assault or rape persons in the custody of the BOP at FPC Alderson.

**160.**   Warden Wilson, Lt. Workman, and Officer Hall directly and proximately caused the violation of C.H.'s rights under the Eighth Amendment of the United States Constitution by failing to make such further inquiries or interventions as would be reasonable given their knowledge that Captain Grimes had been alone for an unknown period of time unsupervised and unobserved in his office with an inmate, thereby placing C.H. in substantial risk of imminent sexual abuse by him.

**161.**   By their acts and omissions, Warden Wilson, Lt. Workman and Officer Hall, placed C.H. in substantial risk of imminent further sexual abuse and took no immediate action to protect C.H. from further sexual abuse by Captain Grimes, as when, for example, they failed to *formally* report or make such further inquiries as would be reasonable given their duty to act immediately in mitigating such risk.

**162.**   Warden Wilson, Lt. Workman and Officer Hall  engaged in a direct violation of C.H.'s constitutional rights by failing to take measures to protect C.H. and all inmates at FPC Alderson in the face of her actual or constructive knowledge of the risk posed by Captain Grimes, thereby subjecting them to substantial risk of imminent sexual abuse.

**COUNT IV**
**Federal Tort Claims Act: NEGLIGENCE**
**(United States of America)**

**163.**   Plaintiff realleges and incorporates paragraphs 1-162.

**164.**   Defendant the United States of America is responsible for the oversight of its employees, which includes officers and staff at federal correctional institutions, including United States Federal Prison Camp Alderson.

**165.**   Pursuant to the Federal Tort Claims Act, the United States is liable for damages caused by the negligent or wrongful acts of its employees acting within the scope of their employment, under circumstances where the United States, if a private person, would be liable in accordance with the laws of the State of West Virginia.

**166.**   Federal law specifically requires the BOP to "provide for the safekeeping, care, and subsistence of all persons charged with or convicted of offenses against the United States" and to "provide for the protection ... of all persons charged with or convicted of offenses against the United States." 18 U.S.C. § 4042(a)(2)-(3).

**167.**   Defendant United States and the supervisors and employees of FPC Alderson have a duty to provide inmates with a safe and secure environment, free of dangers, including the dangers of sexual harassment and sexual assault.

**168.**   As a premises owner/operator, the United States has a duty to provide its invitees with a reasonably safe place, which specifically includes a place reasonably free and safe from known and foreseeable rapists and rape risks.

**169.**   Correctional officers and other prison officials at FPC Alderson have a duty to protect inmates from harm caused by correctional officers and other prison officials.

**170.**   Correctional officers and other prison officials at FPC Alderson have a duty to house inmates in a safe and secure manner.

**171.**   Correctional officers and other prison officials at FPC Alderson have a duty to protect inmates from known and obvious dangers posed by correctional officers and other prison officials.

**172.**   Correctional officers and other prison officials at FPC Alderson have a non-discretionary duty, pursuant to PREA, to enforce a policy of "zero-tolerance" with respect to sexual abuse of inmates by staff.

**173.**   Pursuant to 28 C.F.R. § 115.17(f), FPC Alderson and Warden Wilson had a non-discretionary duty to ask Captain Grimes in interviews and written self-evaluations conducted as part of his performance reviews about all incidents of alleged sexual abuse by Grimes, including but not limited to the incident described by V.J. in her administrative complaint (however technically deficient) and the incidents that Officer Honaker was referring to when she said to C.H. that Grimes's sexual abuse of inmates had been going on for "years." Upon information and belief, FPC Alderson and Warden Wilson breached this non-discretionary duty.

**174.**   Pursuant to 28 C.F.R. § 115.31, BOP and FPC Alderson had a non-discretionary duty to train employees on how to prevent sexual abuse and sexual harassment, the right of inmates to be free from sexual abuse and harassment, the dynamics of sexual abuse and harassment, the common reactions of sexual abuse and harassment victims, and how to detect and respond to signs of threatened and actual sexual abuse. Based on the known and already alleged facts—the incident with V. J. reported to BOP administrative officials; the first rape of C.H. in Grimes's office only steps away from Warden Wilson and Lt. Workman, the meaningful look exchanged between Lt. Workman and C.H. after the rape, and the telling admission by Officer Honaker that Grimes's conduct had been going on for "years"—there are two possibilities: (1) Either FPC Alderson and BOP failed to perform these non-discretionary duties with respect to training, or (2) Warden Wilson, Lt. Workman, BOP administrative officials, and other (as yet unidentified) corrections officers at FPC Alderson were carelessly inattentive to the instructions, training, and visible signs that all around them that Grimes was raping and otherwise assaulting and harassing inmates, including C.H.

**175.**   Pursuant to 28 C.F.R. §§ 115.31 and 115.33, BOP and FPC Alderson had a non-discretionary duty to train employees and advise inmates of their right to be free from retaliation for reporting incidents of sexual harassment and sexual abuse by corrections officers.  Based on the known and already alleged facts—the incident with V. J. reported to BOP administrative officials because of a fear of reporting within FPC Alderson, and the failure of BOP officials to "remind" the individual that she could report without fear of retaliation; the reaction of C.H.; the reactions of Honaker and Workman—it is clear that this training either did not occur or the BOP and FPC Alderson failed to supervise employees to make sure the training was given, understood, and followed.

**176.**   Pursuant to 28 C.F.R. § 115.17, BOP and FPC Alderson officials have non-discretionary duties with respect to the hiring, promotion, and periodic review of their employees. Those non-discretionary duties include duties to consider, with respect to hiring and promotion decisions, any incidents of sexual harassment, whether the inmate has engaged in sexual abuse, and whether the inmate has been convicted or civilly adjudicated of sexual abuse. Upon information and belief, with respect to Defendants the hiring and repeated promotions of Hall and Grimes, BOP and FPC Alderson officials failed to perform their non-discretionary duties.

**177.**   BOP supervisory officials have a duty to monitor, supervise, train, and discipline correctional staff at FPC Alderson in order to ensure that correctional staff properly perform their PREA-mandated duties so that inmates' Eighth Amendment rights are not violated.

**178.**   Corrections officers and supervisors have a non-discretionary duty to report suspicion of sexual abuse by corrections officers and supervisors have a non-

28

discretionary duty to investigate such reports and to take action with respect to substantiated reports.

**179.**    According to Officer Honaker's knowledge and belief, corrections officers at FPC Alderson knew that Captain Grimes posed an excessive and unreasonable risk to the health and safety of C.H. and that he had been sexually abusing inmates at FPC Alderson for "years." One of the following had to have occurred: (1) the correctional officers, as alleged above, breached their non-discretionary duty to report their direct knowledge or belief of Grimes's or other officer's sexual misconduct; (2) the supervisors failed in their non-discretionary duties to investigate and take action with respect to Grimes's specific misconduct; or corrections officers and supervisors were carelessly inattentive with respect to the signs all around them.

**180.**    Prison officials at FPC Alderson knew or should have known that Captain Grimes should not have been permitted to have unsupervised access to inmates, including C.H., to whom he posed an excessive and unreasonable risk.

**181.**    As a direct result of the prison officials' breach of their non-discretionary duties or their reckless, willful, wanton and careless disregard of the obvious and known risk to inmates in improperly performing them, C.H. suffered serious personal injuries and severe emotional distress from sexual abuse and rape at the hands of Grimes despite the fact that, according to at least one corrections officer, employees at FPC Alderson knew for years that Grimes was sexually abusing inmates.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests that this Honorable Court grant her the following relief:

1. Compensatory damages as to all Counts;

2. Punitive damages as to Counts I-III above;

3. Reasonable attorneys' fees and costs; and,

4. Such other further relief as this Court deems just.

Plaintiff hereby demands a jury trial on Counts I- III above.

C.H.,
Plaintiff.

/s/Jay T. McCamic
Jay T.  McCamic, Esq. (WVSB# 2386)
McCamic Law Firm, PLLC
80 12th Street, Ste. 305
P.O. Box 151
Wheeling, WV 26003
Telephone: 304-238-9460
Fax: 304-830-5324
jay@mccamic.com

s/L. Dante diTrapano
L. Danté diTrapano, Esq. (WVSB# 6778)
500 Randolph Street
Charleston, WV 25302
Telephone: 304-343-4323
Fax: 304-344-3684
dditrapano@cldlaw.com

s/Benjamin Adams
Benjamin Adams, Esq. (WSB# 11454)
Calwell Luce diTrapano PLLC
500 Randolph Street
Charleston, WV 25302
Telephone: 304-343-4323
Fax: 304-344-3684
badams@calwelllaw.com

*s/ Alex McLaughlin*
Alex McLaughlin, Esq. (WVSB# 9696)
Calwell Luce diTrapano PLLC
500 Randolph Street
Charleston, WV 25302
Telephone: 304-343-4323
Fax: 304-344-3684
amclaughlin@calwelllaw.com


*s/Anthony I. Werner*
Anthony I. Werner, Esq. (WVSB# 5203)
John & Werner Law Offices, PLLC
Board of Trade Building, STE 200
80 - 12th Street
Wheeling, WV 26003
Telephone: 304-233-4380
Fax: 304-233-4387
awerner@johnwernerlaw.com